UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SANDRA RUSSELL,

                    Plaintiff,

          v.

T-MOBILE USA, INC.,

                    Defendant.

CASE NO. 2:24-cv-00255-MJP

ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

**INTRODUCTION**

This matter comes before the Court on Defendant T-Mobile USA, Inc.'s Motion for

Summary Judgment (Dkt. No. 39.) Having reviewed the Motion, Plaintiff Sandra Russell's

response (Dkt. No. 44), the reply (Dkt. No. 53), the Parties' presentations during oral argument

(Dkt. No. 68), and all other supporting materials, the Court GRANTS IN PART the Motion.

**BACKGROUND**

In 2023, after nearly 17 years of working for Defendant T-Mobile, Plaintiff Sandra

Russell was terminated as part of a planned reduction in force ("RIF"). (See generally Complaint

1   (Dkt. No. 1).) She alleges that her termination—along with a reduction in her year-end bonus in

2   2022—violated federal, state, and local laws as they were (1) based on her age, race, gender, sex,

3   and disability; (2) retaliatory; and (3) against public policy. (Id.) She further alleges that (1)

4   Defendant failed to accommodate her disability; (2) subjected her to a hostile work environment;

5   and (3) failed to pay her as well as similarly situated male employees. (Id.) The Court reviews

6   the relevant facts.

7        Plaintiff began her employment with T-Mobile in 2006. (Declaration of Sandra Russell

8   (Dkt. No. 47) ¶ 3.) In September 2019, Plaintiff became a Product Owner and worked as part of a

9   team supporting T-Mobile's Digitally Assisted Sales Hub (the "DASH" team). (Russell Decl. ¶

10  6; Declaration of Giancarlo Urey (Dkt. No. 43) Ex. B (the "Hampleman Dep.") at 110–11.) As a

11  Product Owner, Plaintiff was responsible for writing "user stories," or succinct descriptions of a

12  user's experience with the DASH system to inform future developments to T-Mobile's products

13  or processes. (Urey Decl., Ex. A (the "Russell Dep.") at 9–10.)

14  **A.    Plaintiff's Managers**

15       Throughout her time as a Product Owner, Defendant assigned various individuals to

16  manage or otherwise supervise Plaintiff. Plaintiff alleges that four of these supervisors

17  discriminated against her in various ways. (Russell Decl. ¶ 4.) For the purposes of these

18  allegations, the Court briefly summarizes the relevant interactions between Plaintiff and three of

19  her supervisors—Bob Bird, Vance Hampleman, and John Barr—below. The Court notes,

20  however, that Plaintiff's interactions with the fourth supervisor, Collin Williams, do not rise to

21  the level of being actionable, and so are not discussed.

22

23

24

### 1.    Bird

In 2021, Bird became the Director of the product and engineering group, which included the DASH team and Plaintiff. (Declaration of Sherri Moore (Dkt. No. 49) ¶ 11.) Responding to employee "concerns about Mr. Bird and treatment" of the "fairly diverse group of employees" he oversaw, Sherri Moore, Plaintiff's former manager, arranged a forum for T-Mobile employees to express their concerns regarding Bird with a company vice president. (Moore Decl. ¶ ¶ 12–18.) At that forum, some employees—including Plaintiff—shared concerns that Bird "was not sensitive or responsive to his diverse employees;" "would not treat employees of color fairly;" and would retaliate against employees who spoke out about their treatment. (Id. ¶¶ 19–20.) After the forum, Plaintiff sent a message to Bird's supervisor, Amy Fulcher, regarding Bird's behavior and perception within the DASH team including that she had "no idea" as to whether Bird would "judge [her] fairly" during her salary review because she did not "know where he stands on diversity and inclusion." (See Russell Decl., Ex. A.) Fulcher passed Plaintiff's message along to Bird. (Id.)

### 2.    Hampleman and Barr

Between September 2021 through April 2023, Plaintiff was supervised by either Hampleman or Barr. (Russell Decl. ¶ 4.) Plaintiff claims that both Hampleman and Barr treated her differently than other non-Black, male employees. (Id. ¶ 9.) They "routinely treated [her] with disrespect, talk[ed] over [her], and did not listen to [her]," all things she claims they did not do with white employees or male employees. (Id.)

Plaintiff claims that Barr treated her like a "servant," and instructed her to organize parties and run personal errands for him. (Russell Decl. ¶¶ 10–11.) He "pressured [her] to work" during her paid time off, Plaintiff recalls Barr once telling her that she should "interact with a

newer employee," noting that she would "not want to be perceived as 'angry'." (Id. ¶ 14.) When Plaintiff spoke with Barr about the challenges she faced at T-Mobile as a Black woman, he "dismissed" her as "paranoid," and once ended the conversation by saying "I'm Jewish." (Id. ¶ 15.) Meanwhile, Plaintiff's interactions with Hampleman were rare and short, and Hampleman excluded her from meetings to which she should otherwise be invited. (Id. ¶¶ 17-18.) Other employees felt that Hampleman held diverse members of his team to "higher standards" than others, which resulted in fewer opportunities and projects being provided to non-white employees. (Declaration of Maxine Jarman (Dkt. No. 46) ¶ 9.)

**B.    Plaintiff's 2022 Bonus**

As a T-Mobile employee, Plaintiff was eligible for yearly bonuses. The amount of each employee's bonus was based on the employee's individual performance, which was determined by the employee's direct manager. (Russell Dep. at 39–40; Urey Decl., Ex. D (the "Williams Dep.") at 170–71.)  In 2022, individual performance bonuses ranged from 80% to 120%. (Bird Dep. at 188.) Approximately 25% of the highest performers received bonuses of 120%; 65% of average performers received 100% bonuses; and the lowest 10% of performers received 80% bonuses. (Hampleman Dep. at 69–70.)

On February 14, Plaintiff met with Hampleman, her direct manager at the time, who informed her that her individual bonus for 2022 would be 80% for four reasons. (Russell Dep. at 144; Hampleman Dep. at 79.) First, Hampleman informed that Plaintiff was not always "available" over Slack, a direct messaging application used by T-Mobile (Hampleman Dep. at 101; Russell Decl. ¶ 23.) Second, Hampleman told Plaintiff that she missed meetings. (Russell Decl. ¶ 23.) Third, Hampleman alleged that due to Plaintiff's unavailability, her co-workers were required to write User Stories for her. (Hampleman Dep. at 104; Russell Decl. ¶ 23.) Fourth,

1    Hampleman said that Plaintiff "spent too much time working on DEI events." (Russell Decl. ¶

2    23.) At that time, Hampleman supervised only two Black employees: Plaintiff and James

3    Strickland. (Jarman Decl. ¶ 32.) Both Plaintiff and Strickland had their bonuses reduced to 80%.

4    (Id.)

5        Plaintiff, unsatisfied with her 80% bonus, contacted Bird and alleged that her reduced

6    bonus was influenced by her race. (Russell Decl., Ex. I.) Bird subsequently sent Plaintiff's

7    concerns to a human resources employee, Treva Theus, who failed to promptly escalate the

8    concerns to T-Mobile's Employee Relations department. (Declaration of Jeffrey Musto (Dkt. No.

9    45), Ex. H at 2.)

10   **C.    Accommodations for Plaintiff's Disability**

11       Plaintiff suffers from a sensitivity to light and sound which trigger migraine headaches.

12   (Russell Decl. ¶ 40.) Defendant originally accommodated Plaintiff's disability by reducing her

13   exposure to overhead lighting in her workspace and by permitting her to work from home when

14   needed. (Russell Decl. ¶¶ 39–41.) Plaintiff had originally received an in-person accommodation

15   through a light-blocking polyester leaf, which prevented her from suffering headaches while

16   working in the office. (Id. ¶ 41.) However, the leaf was determined to be a fire hazard was

17   unavailable as an accommodation. (Russell Decl., Ex. O at 92.) Regardless, Plaintiff was still

18   allowed to work from home when needed. (Bird Dep. at 198.)

19   **D.    Plaintiff's Reassignment as Product Tester**

20       On March 15, 2023, Hampleman assigned Plaintiff additional work as a product tester.

21   (Hampleman Dep. at 274–75; Russell Decl., Ex. J at 70.) Plaintiff viewed her new role as a de

22   facto demotion, though admits that her title remained Product Owner and she was paid at the

23   level of a Product Owner. (Russell Dep. at 7–8.)

24

1

**E.    Plaintiff's Termination**

2

Defendant began having conversation regarding a reduction in force in late 2022. (Bird

3    Dep. at 120.) By January or early February 2023, Defendant had a list of individuals who were

4    proposed to be included in the RIF. (Urey Decl., Ex. G (the "Theus Dep." at 213.) This list

5    included Plaintiff based on her "previous years of performance," (see Bird Dep. at 119–120),

6    which Defendant maintains was "lacking," (see Mot. at 12).

7

Plaintiff was notified of her termination on April 4, 2023, as part of Defendant's "large-

8    scale" RIF "across the product group. (Hampleman Dep. at 282.) Approximately 17 employees

9    in Bird's group were fired because of the RIF. (Declaration of Treva Theus (Dkt. No. 41) ¶ 3.)

10   Plaintiff was the only employee of those 17 who identified as African American. (Id.)

11   **F.    Plaintiff's Lawsuit**

12

On February 23, 2024, Plaintiff filed her lawsuit against her former employer. (See

13   generally, Compl.) Plaintiff brings the following nine claims against Defendant: (1) disability

14   discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.;

15   (2) disability, sex, gender, race, and age discrimination under the Washington Law Against

16   Discrimination ("WLAD"), RCW § 49.60 et seq.; (3) failure to accommodate under the ADA

17   and WLAD; (4) retaliation under the ADA and WLAD; (5) violation of the Washington Equal

18   Pay and Opportunities Act ("EPOA"), RCW § 49.58 et seq.; (6) violation of the anti-

19   discrimination ordinances set forth in King County Code ("KCC") Chapter 12.18; (7) wrongful

20   discharge in violation of public policy; (8) hostile work environment; and (9) retaliation. (Compl.

21   at 10–22.) Defendant moves for summary judgment on all of Plaintiff's claims. (Dkt. No. 39.)

22

23

24

1        **ANALYSIS**

2        In analyzing Defendant's Motion, the Court first addresses the legal standard for

3    summary judgment in Subsection A and then briefly discusses those claims which Plaintiff has

4    either conceded or withdrawn in Subsection B. Subsection C assesses Plaintiff's discrimination

5    claims under the ADA (Claim 1) and WLAD (Claim 2), Subsection D discusses her pair of

6    retaliation claims (Claims 4 & 9), and then Subsection E reviews her unlawful termination

7    claims (Claim 7). The Court then moves to her EPOA claim (Claim 5) in Subsection F, followed

8    by analysis of her hostile work environment claim (Claim 8) in Subsection G, and finally

9    addresses her failure to accommodate claim (Claim 3) in Subsection H.

10   **A.       Legal Standard**

11       Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

12   file, and any affidavits show that there is no genuine issue as to any material fact and that the

13   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

14   an issue of fact exists, the Court must view all evidence in the light most favorable to the

15   nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

16   Lobby, Inc., 477 U.S. 242, 248–50 (1986). A genuine issue of material fact exists where there is

17   sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

18   moving party bears the initial burden of showing that there is no evidence which supports an

19   element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

20   Once the movant has met this burden, the nonmoving party then must show that there is a

21   genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

22   existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

23   matter of law." Celotex, 477 U.S. at 323-24.

24

**B.    Conceded Claims**

The Court first disposes of two claims which Plaintiff has conceded are no longer at issue. First, Plaintiff concedes that her KCC 12.18 claim is improper because that ordinance does not apply to Defendant. (Resp. at 27.) Second, Plaintiff conceded during oral argument that she has withdrawn her age discrimination claims. Therefore, Defendant's Motion is GRANTED as to Plaintiff's KCC 12.18 claim (Claim 6) and as to her age discrimination claims.

**C.    Discrimination Claims Under the ADA and the WLAD (Claims 1 & 2).**

Defendant first argues that it is entitled to judgment as a matter of law on Plaintiff's claims sounding in race, sex, gender, and disability discrimination under both the ADA and the WLAD. For the reasons discussed below, the Court finds that—as a matter of law—Plaintiff cannot make her prima facie showing of sex and disability discrimination. Therefore, the Motion is GRANTED as to those claims. However, finding there to be genuine issues of material fact regarding Plaintiff's race discrimination claim, the Court DENIES the Motion as to that claim.

**1.    Legal Standard**

Disparate treatment claims under federal and state law are governed by the McDonnell Douglas burden-shifting framework. See Curley v. City of N. Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014) (ADA); Hines v. Todd Pac. Shipyards, 127 Wn.App. 356, 370–71 (2005) (WLAD); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Because the WLAD largely mirrors federal law, courts "look to interpretations of federal anti-discrimination laws . . . when applying the WLAD." See Grill v. Costco Wholesale Corp., 312 F. Supp. 2d 1349, 1354 (W.D. Wash. 2004).

Under the McDonnell Douglas framework, Plaintiff must first establish a prima facie case of discrimination by offering direct or indirect evidence of discrimination. See Brzycki v.

1    Harborview Med. Ctr., No. C18-1582-MJP, 2020 WL 1237154, at *6 (W.D. Wash. Mar. 13,

2    2020). The burden then shifts to Defendant to articulate a legitimate nondiscriminatory reason

3    for its actions. Villiarimo v. Aloha Island Air, 281 F.3d 1054, 1062 (9th Cir. 2002), and then

4    back to Plaintiff to produce evidence of pretext. Id.; see also Kastanis v. Education Employees

5    Credit Union, 122 Wn.2d 483 (1993).

6        **2.**     **Plaintiff's Prima Facie Case**

7        The Ninth Circuit has explained that a plaintiff may show "an inference of discrimination

8    in whatever manner is appropriate in the particular circumstances." Hawn, 615 F.3d at 1156

9    (citation omitted). A plaintiff may "offer direct or circumstantial evidence of discriminatory

10    motive[.]" Opara v. Yellen, 57 F.4th 709, 722 (9th Cir. 2023).

11        **a.**     **Direct Evidence**

12        Despite Plaintiff's claims that "there is substantial direct evidence of discrimination

13    directed towards Ms. Russell in the words and actions of her managers," that evidence is not in

14    the record. (Resp. at 17.) Direct evidence includes "conduct or statements by persons involved in

15    the decision-making process that may be viewed as directly reflecting the alleged discriminatory

16    attitude[.]" Opara, 57 F.4th at 722 (cleaned up); see also Dominguez-Curry v. Nev. Transp.

17    Dep't, 424 F.3d 1027, 1039–40 (9th Cir. 2005) (similar). "[I]f believed," direct evidence "proves

18    the fact of discriminatory animus without inference or presumption." Vasquez v. Cnty. of Los

19    Angeles, 349 F.3d 634, 640 (9th Cir. 2003), as amended (Jan. 2, 2004) (cleaned up). "When a

20    plaintiff . . . seeks to establish a prima facie case through the submission of actual evidence, very

21    little such evidence is necessary." Opara, 57 F.4th at 723 (quoting Schnidrig v. Columbia Mach.,

22    Inc., 80 F.3d 1406, 1409 (9th Cir. 1996)); see also Dominguez-Curry, 424 F.3d at 1039 ("[I]n

23    this circuit, we have repeatedly held that a single discriminatory comment by a plaintiff's

24

1   supervisor or decisionmaker is sufficient to preclude summary judgment for the employer.")

2   (citations omitted).

3           The only evidence provided by Plaintiff which could be construed as "direct" evidence of

4   any discrimination is Barr warning her that "she risked being perceived as an angry black woman

5   if she did not interact with a new employee." (Resp. at 17.) But that statement is not accurate:

6   Plaintiff avers only that Barr "told [her] that she did not want to be perceived as 'angry.'"

7   (Russell Decl. ¶ 14.) Neither race nor sex nor gender were directly implicated in that statement

8   and Plaintiff's subjective belief that the remark was racially motivated is not sufficient to show

9   direct evidence of discrimination. See Rivera v. National R.R. Passenger Corp., 331 F.3d 1074,

10  1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat

11  summary judgment").

12                  **b.    Indirect Evidence**

13          Plaintiff may still establish her prima facie case based on circumstantial evidence by

14  showing: (1) that she is a member of a protected class; (2) that she was qualified for her positions

15  and was performing her jobs satisfactorily; (3) that she experienced adverse employment actions;

16  and (4) that (a) similarly situated individuals outside her protected class were treated more

17  favorably, or (b) other circumstances surrounding the adverse employment action give rise to an

18  inference of discrimination. See Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1156 (9th Cir.

19  2010). The Parties dispute the fourth element.

20          "To establish similarity under the McDonnell Douglas framework, the individuals being

21  compared 'need not be identical; they must only be similar in all material respects.'" Ballou v.

22  McElvain, 29 F.4th 413, 423 (9th Cir. 2022). "[I]ndividuals are similarly situated when they

23  have similar jobs and display similar conduct." Vasquez v. Cty. of Los Angeles, 349 F.3d 634,

24  641 (9th Cir. 2003). Defendant argues that Plaintiff's sex and disability discrimination claims fail

1    because she cannot show that similarly situated employees outside of those classes were treated

2    more favorably. (Mot. at 12.) The Court agrees. Plaintiff was terminated as part of the RIF

3    alongside white, male, and non-disabled employees. (Theus Decl. ¶ 4.) And Plaintiff's male,

4    non-disabled colleague also received an 80% bonus in 2022. (Jarman Decl. ¶ 32; Declaration of

5    Jennifer Lamb (Dkt. No. 42) ¶ 3.) The Court finds that Plaintiff fails show that similarly situated

6    able-bodied and male colleges were treated more favorably than her, nor does the record show

7    other circumstances which may allow for an inference of discriminatory motive on the basis of

8    sex or disability. Therefore, the Court GRANTS the Motion as to Plaintiff's sex and disability

9    discrimination claims under both the ADA (Claim 1) and the WLAD (Claim 2).

10        However, the Court finds that Plaintiff has made her prima facie case of racial

11    discrimination under the WLAD. Plaintiff provides indirect evidence of racial discrimination by

12    demonstrating that "other circumstances surrounding the adverse employment action give rise to

13    an inference of discrimination." Reynaga v. Roseburg Forest Prods., 847 F.3d 678, 691 (9th Cir.

14    2017); see also Lui, 129 F.4th at 778 (describing the fourth element as "a catch-all requiring only

15    that the adverse action occurred under circumstances giving rise to an inference of

16    discrimination.") (cleaned up). The only two Black employees managed by Hampleman in 2022

17    had their bonuses reduced. The record includes numerous concerns voiced by former T-Mobile

18    employees regarding Bird, Hampleman, and Barr's treatment of non-white employees. When

19    viewing this evidence in the light most favorable to Plaintiff, the Court finds that she overcomes

20    the relatively low bar set by the Ninth Circuit in making her prima facie case of race

21    discrimination. See Hawn, 615 F.3d at 1158 (noting that a plaintiff's burden to make a prima

22    facie case of discrimination is "not onerous.") (citing Wheeler v. Aventis Pharm., 360 F.3d 853,

23    857 (8th Cir. 2004)).

24

### 3.    Legitimate, Nondiscriminatory Reason

Because Plaintiff established a prima facie case of race discrimination, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." Opara, 57 F.4th at 725 (citing Chuang v. Univ. of California Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000)) (cleaned up). "This burden is one of production, not persuasion . . . [and] involve[s] no credibility assessment." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)) (cleaned up). Defendant's justification for Plaintiff's 80% bonus was based on the performance review she received from Hampleman. Similarly, Defendant argues that Plaintiff's position was eliminated due to her performance, which was "lacking." (Mot. at 12.) Defendant later clarifies that "Plaintiff was ultimately laid off as part of a larger reduction in force across the Digital organization." (Reply at 6.) The Court accepts that individual performance and blanket reductions in force constitute legitimate, nondiscriminatory reasons to terminate an employee.

### 4.    Pretext

With Defendant having met its burden to produce legitimate, nondiscriminatory reasons for the challenged actions, the burden shifts back to Plaintiff to "show that the articulated reason is pretextual." Opara, 57 F.4th at 723. Pretext may be shown in two ways, "either: (1) 'directly, by showing that unlawful discrimination more likely [than not] motivated the employer;' (2) 'indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable;' or via 'a combination of these two kinds of evidence.' " Id. (quoting Chuang, 225 F.3d at 1127) (cleaned up). Plaintiff needs very little evidence to raise a genuine issue of fact regarding Defendant's motive; "evidence . . .

1    that the employer's asserted justification is false, may be enough." Id. at 723–24 (emphasis in

2    original) (quoting Reeves, 530 U.S. at 148).

3         There are genuine disputes of material fact as to whether Defendant's proffered reasons

4    for her reduced bonus and termination were pretextual. As to the reduced bonus, there is a factual

5    dispute as to whether Hampleman's proffered justifications for the reduced bonus were true due

6    to internal inconsistencies and contradictory evidence in the record. First, Hampleman's

7    criticisms regarding Plaintiff's availability on Slack are contradicted by Bird's deposition

8    testimony that bonus decisions should not be based on Slack. (Musto Decl., Ex. U at 47–48.)

9    Second, Hampleman's criticism that Plaintiff had missed meetings is inconsistent with the

10   concerns raised by Plaintiff that she had been intentionally excluding her from meetings. (See,

11   e.g., Russell Decl., Ex. D (chat log of Plaintiff complaining to Hampleman of being excluded

12   from meetings).) Third, Hampleman's criticism of other team members needing to write

13   Plaintiff's User Stories for her does not appear to be outside of the normal business practices for

14   the Digital Team. (See Moore Decl. ¶ 38 (the creation of 6-8 user stories by other team member

15   is "not abnormal nor . . . a basis for concern about a product owner's performance or reducing

16   their bonus.").) These inconsistencies are exacerbated by evidence that Hampleman was unable

17   to appropriately justify or explain his reduction of Plaintiff's bonus during a manager's meeting,

18   (Jarman Decl. ¶¶ 31–32,) and by Bird himself questioning the validity of Hampleman's

19   assessment of Plaintiff's performance, (Musto Decl., Ex. U at 50; Ex. F at 3.) In the aggregate,

20   the Court finds that there is a genuine issue of fact as to whether Hampleman's evaluation of

21   Plaintiff's work was pretext for discrimination.

22        As to the termination, the record shows additional inconsistencies which raise questions

23   as to whether Defendant's reasons for terminating Plaintiff were pretextual. First, in an internal

24

1  email, a T-Mobile Human Resources officer writes that Plaintiff's termination was "due to

2  reductions in roles and scope in the department, <u>nothing to do with performance</u>." (<u>See</u> Musto

3  Decl., Ex. H at 3.) This contradicts Defendant's claim that Plaintiff was laid off because of her

4  performance. (<u>See</u> Mot. at 12; Reply at 6.) Similarly, Defendant's additional underlying

5  justification for terminating Plaintiff—that T-Mobile was moving away from Product Owners

6  (<u>see</u> Musto Decl., Ex. U at 35)—is undermined by Hampleman's promotion of a white male

7  employee to the Product Owner role shortly after Plaintiff was fired from that role. (Hampleman

8  Dep. at 114.) At this stage, the contradiction between Defendant's proffered rationale and the

9  evidence in the record weighs against granting summary judgment on Plaintiff's race

10  discrimination claim. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) ("When opposing parties tell

11  two different stories, one of which is blatantly contradicted by the record, . . . a court should not

12  adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

13  Accordingly, Defendant's Motion is DENIED as to Plaintiff's race discrimination claim under

14  the WLAD (Claim 2).

15  **D.    Retaliation (Claims 4 & 9)**

16      Plaintiff's Fourth and Ninth causes of action sound in retaliation, and so the Court

17  analyzes them together. Defendant argues both claims fail as a matter of law because there is no

18  evidence to show a causal link between Plaintiff's "complaint about her bonus or request for a

19  reasonable accommodation" and "T-Mobile's decision to terminate her employment." (Motion at

20  17–18.) The Court disagrees with Defendant.

21      Like disparate treatment claims under WLAD, "a plaintiff may defeat summary judgment

22  in a retaliation claim with direct evidence or through the <u>McDonnell Douglas</u> burden shifting

23  scheme." <u>Houserman v. Comtech Telecomms. Corp.</u>, No. C19-0644-RAJ, 2020 WL 7773417, at

24

*8 (W.D. Wash. Dec. 30, 2020). Under both state and federal law, a prima facie case of retaliation requires proof that the plaintiff (1) "engaged in a protected activity," (2) "suffered an adverse action," and (3) can establish "a causal connection between the protected activity and the adverse action." Brzycki, 2020 WL 1237154, at *7 (citing Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2003). In the retaliation context, an adverse action "consists of conduct which would dissuade a reasonable worker from engaging in protected activity." Id. (citing BNSF Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Defendant's causal argument fails for at least two reasons. First, Defendant incorrectly assumes that the first instance of protected activity occurred on February 14, 2023, when she complained about her 80% bonus being influenced by her race. However, Plaintiff sent a message to Fulcher discussing Bird potentially discriminating against employees of color in by at least August 19, 2021. (Russell Decl., Ex. A.) Among other things, Plaintiff voiced concerns regarding how Bird would evaluate her as a Black woman, given that she "ha[d] no idea" as to his position on Defendant's DEI efforts. (Id.) Plaintiff herself identified this email as a basis for retaliation. (See Russell Dep. at 37-38 ("With Bob, I have a hard time believing that me being laid off doesn't stem back to the letter I wrote to Amy because he had the opportunity to jump on board and be retaliatory.").) The Court notes that while Fulcher claims to have "scrubbed" Plaintiff's message for identifying information, it still includes information that could still indicate Plaintiff's authorship, such as her 2006 start date and Bird's behavior during a particular presentation given by Plaintiff. (Russell Decl., Ex. A.) Bird acknowledged receiving this email on August 30, 2021. (Id.) Bird's decision to terminate Plaintiff was made nearly a year and a half later. (See Theus Dep. at 213 (noting that decision was made around January 2023)). While the protected activity and adverse employment action are somewhat distant, there is no per se too

1    long or too short period of time that satisfies the causation requirement in a retaliation claim. See

2    Howard v. City of Coos Bay, 871 F.3d 1032, 1046 (9th Cir. 2017). Bird's decision to terminate

3    Plaintiff could feasibly have been the result of Plaintiff's earlier email to Fulcher, and therefore

4    her retaliation claim cannot be precluded as a matter of law.

5        Second, even if the first instance of protective action occurred on February 14, 2023,

6    Plaintiff presents a genuine dispute of material fact that her subsequent "demotion" constitutes

7    an adverse employment action for the purposes of retaliation. "[A]n action is cognizable as an

8    adverse employment action if it is reasonably likely to deter employees from engaging in

9    protected activity." Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000); Burlington N. &

10   Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). "The standard for an adverse employment

11   action is a material employment disadvantage, such as a tangible change in duties, working

12   conditions or pay." Nahum v. Boeing Co., No. 2:19-CV-1114-BJR, 2019 WL 6878242, at *3

13   (W.D. Wash. Dec. 17, 2019), aff'd, No. 21-35008, 2025 WL 670969 (9th Cir. Mar. 3, 2025), and

14   aff'd, No. 21-35008, 2025 WL 670969 (9th Cir. Mar. 3, 2025).

15       Defendant argues that Plaintiff's role change was not a demotion as she already

16   performed some testing work, retained her job title, and did not suffer a pay decrease. (Mot. at

17   7.) However, even if not considered a demotion, Plaintiff describes her tangible change in duties

18   as "undesirable." (Russell Decl. ¶ 33.) Whether the imposition of additional testing duties would

19   constitute an adverse employment action is material to Plaintiff's retaliation claim. Accordingly,

20   Defendant's Motion is DENIED as to Plaintiff's retaliation claims (Claims 4 & 9).

21

22

23

24

**E.    Wrongful Discharge in Violation of Public Policy (Claim 7)**

Defendant argues that Plaintiff's wrongful discharge in violation of public policy claim fails as a matter of law because it is duplicative of her discrimination and retaliation claims. (Mot. at 18–19.) The Court disagrees.

"To maintain a common law claim for wrongful discharge, a plaintiff must prove four elements: (1) the existence of a clear public policy, (2) that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy (the 'jeopardy' element), (3) that the conduct caused the dismissal, and (4) that the defendant has not offered an overriding justification for the dismissal." Gamble v. Pac. Nw. Reg'l Council of Carpenters, No. 2:14-CV-00455RSM, 2015 WL 402782, at *6 (W.D. Wash. Jan. 29, 2015) (citing Lee v. Rite Aid Corp., 917 F. Supp. 2d 1168, 1175 (E.D. Wash. 2013)).

At oral argument, Defendant conceded that its argument as to Plaintiff's wrongful discharge claim did not accurately describe Washington law. The Washington Supreme Court has held that dismissal of a wrongful discharge claim as a matter of law is appropriate only where the alternative statutory remedy is intended to be exclusive. See Rose v. Anderson Hay & Grain Co., 184 Wn.2d 268 (2015). Courts in this district have since denied duplicative arguments like those now raised by Defendant. See, e.g., Bradley v. Swedish Health Servs., No. C22-0581 TSZ, 2023 WL 8879121, at *8 (W.D. Wash. Dec. 22, 2023). Accordingly, the Motion is DENIED as to Plaintiff's wrongful discharge claim (Claim 7).

**F.    Washington's Equal Pay and Opportunities Act (Claim 5)**

Defendant next argues that Plaintiff's EPOA claim fails as a matter of law because she cannot show that she received less pay because of her gender. (Mot. at 20.) The Court agrees.

The EPOA prohibits "providing compensation based on gender between similarly employed employees." RCW 49.58.020(1). "Employees are similarly employed if the individuals work for the same employer, the performance of the job requires similar skill, effort, and responsibility, and the jobs are performed under similar working conditions." RCW 49.58.020(2). The EPOA is virtually identical to its federal counterpart, the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and, as such, "[d]ecisions interpreting the federal act may then be helpful." Hudon v. W. Valley Sch. Dist. No. 208, 123 Wn. App. 116, 124 (2004). Notably, the federal law "does not prohibit variations in wages; it prohibits discriminatory variations in wages." Hein v. Oregon Coll. of Educ., 718 F.2d 910, 916 (9th Cir. 1983) (emphasis in original). "If it should turn out that [Plaintiff] earns more than males performing substantially equal work, it is axiomatic that the [EPOA] does not afford her relief." Id. (emphasis in original). Here, Defendant provides undisputed evidence that Plaintiff was paid more than a male Product Owner and a male Senior Product Owner in the Digital Group. (Theus Decl. ¶ 4, Ex. 2.) Accordingly, the Motion is GRANTED as to Plaintiff's EPOA claim (Claim 5).

**G.    Hostile Work Environment (Claim 8)**

Defendant next argues that Plaintiff fails to show that she was subject to harassment due to her race, sex, gender, disability, or age, and therefore her hostile work environment claim fails as a matter of law. (Mot. at 21–22.) The Court agrees.

To establish her hostile work environment claim, Plaintiff must show (1) that she was subjected to verbal or physical conduct because of her protected class (2) that the conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. See Manatt v. Bank of Am., NA, 339 F.3d 792, 798 (9th Cir. 2003). "The working environment must both subjectively and

1    objectively be perceived as abusive." <u>Id.</u> at 800 n.6 (quoting <u>Brooks v. City of San Mateo</u>, 229

2    F.3d 917, 923 (9th Cir. 2000)). The WLAD's formulation of a hostile-work environment claim is

3    largely the same as that of the federal statue. <u>Glasgow v. Georgia-Pacific Corp.</u>, 103 Wn.2d 401

4    (1985). The Court must "look at all the circumstances, including the frequency of the

5    discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

6    offensive utterance; and whether it unreasonably interferes with an employee's work

7    performance." <u>Nichols v. Azteca Rest. Enters., Inc.</u>, 256 F.3d 864, 872 (9th Cir. 2001) (internal

8    quotations omitted).

9        The record here does not show that Plaintiff herself endured the type of harassment

10    severe or pervasive enough to rise to the level of "a discriminatorily hostile or abusive

11    environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). Plaintiff relies on the

12    experiences of others to construct her hostile work environment claim. For example, Moore

13    avers that Bird "would berate [her] to a severity and in ways [she] did not see him do with other

14    white or male employees." (Moore Decl. ¶ 16.) But Moore is not the plaintiff here. Even when

15    viewing the record in her favor, Plaintiff's interactions with Bird and Barr were perhaps

16    unpleasant, but not threatening, humiliating, or otherwise subjectively and objectively perceived

17    as abusive. A hostile work environment claim requires more than an unkind boss. Furthermore,

18    Plaintiff's complaints regarding Hampleman—that he was dismissive and disengaged—are on

19    the opposite end of the spectrum to the type of verbal and physical conduct needed to establish a

20    hostile workplace claim. Because Plaintiff cannot show that she herself was subjected to the type

21    of verbal and physical conduct found to constitute a hostile work environment, the Court

22    GRANTS Defendant's Motion as to Plaintiff's hostile work environment claim (Claim 8).

23

24

**H.    Failure to Accommodate (Claim 3)**

Defendant next argues that Plaintiff's failure to accommodate claim fails as a matter of law because she was allowed to work from home due to her disability. (Mot. 19–20.) The Court agrees.

To make a prima facie case of failure to accommodate under either the WLAD or the ADA, Plaintiff must demonstrate that (1) she is disabled; (2) she is qualified for the job in question and capable of performing it with reasonable accommodation; (3) the employer had notice of her disability; and (4) the employer failed to reasonably accommodate her disability. See Samper v. Providence St. Vincent Med. Cntr., 675 F.3d 1233, 1237 (9th Cir. 2012); Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1088–89 (9th Cir. 2002); Davis v. Microsoft Corp., 149 Wn.2d 521 (2003). If an employee identifies a disability that may require accommodation, the employer has a mandatory duty under the ADA to engage in a good faith interactive process of identifying essential and nonessential job tasks and possible accommodations, assessing the reasonableness and effectiveness of the accommodations, and implementing the accommodation most appropriate for the employee and employer that does not impose an undue hardship on the employer. Steenmeyer v. Boeing Co., 92 F. Supp. 3d 1024, 1030 (W.D. Wash. 2015) (citing Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000), vacated in part on other grounds by 535 U.S. 391 (2002)). The employee's expressed preference as to accommodation must be taken into consideration. Id.

Plaintiff argues that she "had issues getting her managers to actually take her accommodation seriously," which "effectively denied [Plaintiff] her accommodation." (Resp. at 27.) But Plaintiff was never denied an accommodation for her disability. It is undisputed that allowing Plaintiff to work from home was a reasonable accommodation for her disability. See

1    Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1136 (9th Cir. 2001) ("Working at home is a

2    reasonable accommodation when the essential functions of the position can be performed at

3    home and a work-at-home arrangement would not cause undue hardship for the employer.")

4    Indeed, Plaintiff admits that she "worked a hybrid role in which [she] was permitted to work

5    from home and the office." (Russell Decl. ¶ 39.) That Plaintiff may have preferred other

6    accommodations does not change the fact that Defendant reasonably accommodated her

7    disability as required by state and federal law. See Sharpe v. Am. Tel. & Tel. Co., 66 F.3d 1045,

8    1050 (9th Cir. 1995) (Upon finding and providing reasonable accommodation, "[Defendant]

9    satisfied its legal obligation, and the inquiry is over."). Accordingly, the Motion is GRANTED as

10   to Plaintiff's failure to accommodate claim (Claim 3).

**CONCLUSION**

12          Defendant's Motion is GRANTED IN PART and DENIED IN PART.

13          Several of Plaintiff's claims fail as a matter of law. First, Plaintiff fails to draw an

14   inference that her termination or reduced bonus were the result of her disability. Second, Plaintiff

15   cannot show that Defendant failed to accommodate her disability, as it is undisputed that she was

16   permitted to work from home. Third, Defendant has provided unrefuted evidence that Plaintiff

17   was compensated as well or better than other male Product Owners in Bird's group. Fourth, as a

18   business located in incorporated King County, Plaintiff's KCC claims do not apply. Finally,

19   Plaintiff does not show that she was subject to a hostile workplace environment beyond

20   unpleasant interactions with her supervisors. The Court GRANTS Defendant's motion as to (1)

21   Plaintiff's discrimination claim under the ADA (Claim 1); (2) Plaintiff's failure to accommodate

22   claims under the ADA and WLAD (Claim 3); (3) Plaintiff's EPOA claim (Claim 5); (4)

1   Plaintiff's discrimination claim under KCC Chapter 12.18 (Claim 6); and (5) Plaintiff's hostile

2   work environment claim (Claim 8).

3       Plaintiff provides insufficient evidence to show that her reduced bonus or termination

4   were influenced by her disability, gender, or sex. She has also withdrawn her allegations that she

5   was discriminated against on the basis of her age. Therefore, the Court GRANTS IN PART

6   Defendant's motion as to Plaintiff's WLAD claim (Claim 2) insofar as she alleges discrimination

7   based on disability, age, gender, or sex.

8       The Court finds there remain genuine disputes of material fact as to Plaintiff's remaining

9   claims. Defendant's alleged non-discriminatory reasons for Plaintiff's reduced bonus and

10  termination are contradicted by the evidence, which presents a factual question as to whether

11  those reasons were mere pretext. Similarly, there is a material dispute as to whether Plaintiff's

12  termination was a consequence of her complaints regarding Bird's management of diverse

13  employees or whether her reassignment of additional testing responsibilities constitutes an

14  adverse employment action. Finally, Defendant's argument regarding Plaintiff's wrongful

15  discharge claim fails as a matter of law. Accordingly, summary judgment is DENIED as to (1)

16  Plaintiff's race discrimination claims under the WLAD (Claim 2); (2) Plaintiff's retaliation

17  claims (Claims 4 & 9); and (3) Plaintiff's wrongful discharge in violation of public policy claim

18  (Claim 7).

19      The clerk is ordered to provide copies of this order to all counsel.

20      Dated June 2, 2025.

21

22      Marsha J. Pechman
        United States Senior District Judge

23

24